UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


LARRY JACKSON,

    Petitioner,

                                        CASE NO. 2:07-CV-13499
    v.                                  JUDGE BERNARD A. FRIEDMAN
                                        MAGISTRATE JUDGE PAUL J. KOMIVES
LLOYD RAPELJE,

    Respondent.
_____/


## REPORT AND RECOMMENDATION

*Table of Contents*

I.      RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2
II.     REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2
        A.      *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2
        B.      *Factual Background Underlying Petitioner's Conviction* . . . . . . . . . . . . . . . . . . . . . . . . .  6
        C.      *Procedural Default* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11
        D.      *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13
        E.      *Weight and Sufficiency of the Evidence and Innocence (Claims I, V, and VI)* . . . . . . . . . . . . . .  15
                1.      *Weight of the Evidence (Claim VI)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16
                2.      *Sufficiency of the Evidence (Claim I)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16
                        a. Clearly Established Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17
                        b. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19
                3.      *Innocence (Claim V)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20
        F.      *Due Diligence (Claim II)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23
        G.      *Prosecutorial Misconduct (Claim VII)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24
                1.      *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24
                2.      *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25
        H.      *Ineffective Assistance of Counsel (Claims III & IV)* . . . . . . . . . . . . . . . . . . . . . . . . . . .  26
                1.      *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26
                2.      *Trial Counsel* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28
                        a. Failure to Present Alibi . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28
                        b. Failure to Obtain Blood Test  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32
                        c. Failure to Object to Hearsay and Pathologist Testimony . . . . . . . . . . . . . . . . . . .  33
                        d. Closing Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  37
                3.      *Appellate Counsel* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  38
        I.      *Recommendation Regarding Certificate of Appealability* . . . . . . . . . . . . . . . . . . . . . . . . . .  39
                1.      *Legal Standard* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39
                2.      *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40
        J.      *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41
III.    NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41

I.      RECOMMENDATION: The Court should deny petitioner's application for the writ of habeas corpus and should deny petitioner a certificate of appealability.

II.     REPORT:

A.      *Procedural History*

1.      Petitioner Larry Jackson is a state prisoner, currently confined at the Richard A. Handlon Correctional Facility in Ionia, Michigan.

2.      On September 1, 2004, petitioner was convicted of first degree murder, MICH. COMP. LAWS § 750.316; and possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b, following a jury trial in the Wayne County Circuit Court.  On September 17, 2004, he was sentenced to a mandatory term of life imprisonment without parole on the murder conviction, and to a mandatory consecutive term of two years' imprisonment on the felony-firearm conviction.

3.      Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

I.      THE PROSECUTION FAILED TO PRODUCE LEGALLY SUFFICIENT EVIDENCE OF APPELLANT'S GUILT BEYOND A REASONABLE DOUBT, BOTH IN TERMS OF WHO SHOT THE DECEDENT AND/OR SUFFICIENT EVIDENCE ON THE ESSENTIAL ELEMENT OF PREMEDITATION.

II.     THE TRIAL COURT REVERSIBLY ERRED IN RULING THAT THE POLICE AND PROSECUTION USED DUE DILIGENCE IN SEEKING TO LOCATE AND PRODUCE ENDORSED WITNESSES ROSLYN MIMS AND MELVIN BURTON, AND THUS DENYING A DEFENSE REQUEST FOR AN INSTRUCTION THAT THE JURY HAD TO INFER HAD THEY TESTIFIED THEIR TESTIMONY WOULD HAVE BEEN ADVERSE TO THE PROSECUTION.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence.

2

*See People v. Jackson*, No. 258195, 2006 WL 66682 (Mich. Ct. App. Jan. 12, 2006) (per curiam).

4.     Petitioner, proceeding *pro se*, sought leave to appeal these issues to the Michigan

Supreme Court.  The Supreme Court denied petitioner's application for leave to appeal in a standard

order.  *See People v. Jackson*, 476 Mich. 863, 720 N.W.2d 305 (2006).

5.     On August 20, 2007, petitioner filed a motion for relief from judgment in the trial

court pursuant to MICH. CT. R. 6.500-.508, raising the following claims:

I.      WAS TRIAL COUNSEL INEFFECTIVE FOR FAILING TO PRESENT DEFENDANT'S KNOWN ALIBI DEFENSE, AND FOR FAILING TO OBTAIN [A] BLOOD TEST ONCE HE LEARNED THAT THERE WAS SOMEONE ELSE AT THE SCENE OF THE CRIME; FOR FAILING TO OBJECT TO HEARSAY; FOR FAILING TO OBJECT TO THE PATHOLOGIST.

II.     DOES APPELLA[TE] COUNSEL'S FAILURE TO RAISE THESE ISSUES ON APPELLANT'S PRIOR APPEAL AMOUNT TO INEFFECTIVE ASSISTANCE OF COUNSEL.

III.    SHOULD THE DEFENDANT BE GRANTED A NEW TRIAL BASED ON ACTUAL INNOCENCE WHERE THE PHYSICAL EVIDENCE PROVES THAT THE DECEDENT DIED FROM A DIFFERENT WEAPON OTHER THAN THE WEAPON APPELLANT WAS ALLEGED TO HAVE POSSESSED.

IV.    DID THE TRIAL COURT ABUSE ITS DISCRETION BY NOT GRANTING DEFENDANT'S MOTION FOR A NEW TRIAL, BECAUSE THE VERDICT WAS AGAINST THE GREAT WEIGHT OF THE EVIDENCE.

V.     SHOULD DEFENDANT BE GRANTED A NEW TRIAL BECAUSE OF [THE] PROSECUTION'S ASSERTIONS OF THINGS NOT IN EVIDENCE AND OTHER ACTS OF PROSECUTORIAL MISCONDUCT.

VI.    SHOULD DEFENDANT BE GRANTED A NEW TRIAL BECAUSE OF THE CUMULATIVE EFFECT OF ALL THESE ERRORS COMBINED.

VII.   DISTRICT AND CIRCUIT COURT DEPRIVED DEFENDANT OF HIS CONSTITUTIONAL RIGHT TO DUE PROCESS, DUE TO AN INVALID ARREST WARRANT. . . .  BECAUSE THERE WAS NO COMPLAINT

3

FILED WITH THE DISTRICT COURT THE DISTRICT COURT COULD NOT HAVE HAD PROBABLE CAUSE TO ISSUE A WARRANT WITHOUT A COMPLAINT, BECAUSE THE COMPLAINT IS WHAT INITIATES THE CRIMINAL PROCEEDING. DEFENDANT CONTENDS THAT THESE COURTS LACKED LAWFUL JURISDICTION TO INVOLVE ITSELF IN EFFORTS TO INITIATE A CRIMINAL PROSECUTION.

VIII.   TRIAL AND APPELLA[TE] COUNSEL WERE INEFFECTIVE FOR NOT DISCOVERING AND/OR RAISING THIS ISSUE.

Petitioner also filed a motion for new trial, raising his ineffective assistance of counsel claims. The trial court held an evidentiary hearing on the motion for new trial. On December 4, 2007, the trial court denied petitioner's motion for relief from judgment and motion for new trial in separate orders. The court denied the claims on the merits, with the exception of his innocence, sufficiency of the evidence, and weight of the evidence claims, which the trial court denied pursuant to MICH. CT. R. 6.508(D)(2) on the basis that the claims had been raised and decided on direct appeal. *See People v. Jackson*, No. 04-003384-01 (Wayne County, Mich., Cir. Ct. Dec. 4, 2007) (separate orders denying relief from judgment and denying new trial) [hereinafter "MRJ Order" and "New Trial Order"]. The Michigan Court of Appeals and Michigan Supreme Court denied petitioner's applications for leave to appeal in standard orders, based on petitioner's "failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Jackson*, 485 Mich. 974, 774 N.W.2d 905 (2009); *People v. Jackson*, No. 288765 (Mich. Ct. App. Apr. 3, 2009).

6.      Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus on June 27, 2007, while his motion for relief from judgment was pending. Petitioner also filed a motion to hold the case in abeyance pending the completion of the state court proceedings. The Court granted the motion on September 13, 2007. On December 11, 2009, petitioner filed an amended application, and the Court entered an order reopening the case on January 6, 2010. As

4

grounds for the writ of habeas corpus, petitioner raises the following claims, as set forth in his

amended application:

I.    THE PROSECUTION FAILED TO PRODUCE LEGALLY SUFFICIENT
      EVIDENCE OF PETITIONER'S GUILT BEYOND A REASONABLE
      DOUBT, BOTH IN TERMS OF WHO SHOT THE DECEDENT AND/OR
      SUFFICIENT EVIDENCE ON THE ESSENTIAL ELEMENT OF
      PREMEDITATION.

II.   THE TRIAL COURT REVERSIBLY ERR[ED] IN RULING THAT THE
      POLICE AND PROSECUTION USED DUE DILIGENCE IN SEEKING TO
      LOCATE AND PRODUCE ENDORSED WITNESSES ROSLYN MIMS
      AND MELVIN BURTON, AND THUS DENYING A DEFENSE
      REQUEST FOR AN INSTRUCTION THAT THE JURY HAD TO INFER
      HAD THEY TESTIFIED THEIR TESTIMONY WOULD HAVE BEEN
      ADVERSE TO THE PROSECUTION.

III.  WAS TRIAL COUNSEL INEFFECTIVE FOR FAILING TO PRESENT
      PETITIONER'S KNOWN ALIBI DEFENSE, AND FOR FAILING TO
      OBTAIN [A] BLOOD TEST ONCE HE LEARNED THAT THERE WAS
      SOMEONE ELSE AT THE SCENE OF THE CRIME; FOR FAILING TO
      OBJECT TO HEARSAY; FOR FAILING TO OBJECT TO THE
      PATHOLOGIST TESTIMONY BECAUSE HE DID NOT PERFORM THE
      TEST ON THE DECEDENT OR RECORD THE RESULTS; FOR
      FAILING TO ARGUE TO THE JURY THAT PETITIONER COULD NOT
      HAVE KILLED DECEDENT BECAUSE THE WEAPON THAT WAS
      ALLEGED TO HAVE CAUSED HIS DEATH WAS ONLY FIRED INTO
      THE BEDROOM AND DECEDENT ACCORDING TO THE
      PROSECUTION WAS SHOT AT THE FRONT DOOR.

IV.   DOES APPELLATE COUNSEL'S FAILURE TO RAISE THESE ISSUES
      ON PETITIONER'S PRIOR APPEAL AMOUNT TO INEFFECTIVE
      ASSISTANCE OF COUNSEL.

V.    SHOULD THE PETITIONER BE GRANTED A NEW TRIAL BASED ON
      ACTUAL INNOCENCE WHERE THE PHYSICAL EVIDENCE PROVES
      THAT THE DECEDENT DIED FROM A DIFFERENT WEAPON OTHER
      THAN THE WEAPON PETITIONER WAS ALLEGED TO HAVE
      POSSESSED.

VI.   DID THE TRIAL JUDGE ABUSE ITS DISCRETION BY NOT
      GRANTING PETITIONER'S MOTION FOR A NEW TRIAL, BECAUSE
      THE VERDICT WAS AGAINST THE GREAT WEIGHT OF THE

EVIDENCE.

VII.   SHOULD PETITIONER BE GRANTED A NEW TRIAL BECAUSE OF [THE] PROSECUTION'S ASSERTIONS OF THINGS NOT IN EVIDENCE AND OTHER ACTS OF PROSECUTORIAL MISCONDUCT.

VIII.   SHOULD PETITIONER BE GRANTED A NEW TRIAL BECAUSE OF THE CUMULATIVE EFFECT OF ALL THESE ERRORS COMBINED.

7.   Respondent filed his answer on July 14, 2010.  He contends that petitioner's third and fifth through eighth claims are barred by petitioner's procedural default in the state courts, and that all of petitioner's claims are either without merit or not cognizable on habeas review.

8.   Petitioner filed a reply to respondent's answer on August 5, 2010.

B.   *Factual Background Underlying Petitioner's Conviction*

The factual background underlying petitioner's conviction was accurately summarized in petitioner's brief in the Michigan Court of Appeals:

> Petitioner Larry Jackson, Jr. ("petitioner") was charged with first-degree premeditated murder [MCL § 750.316] and felony firearm [MCL § 750.227b]. The prosecution alleged that the events occurred on March 9, 2004 at 16540 Schaefer #4 in the city of Detroit, Michigan. On March 24, 2004, petitioner appeared in the 36th District Court for preliminary examination.
>
> At the examination, the parties stipulated that on March 10, 2004, medical examiner Francisco Diaz examined the 27-year-old body of Keith Journey ("Journey") and concluded that Journey died of multiple (seven) gunshot wounds. Specifically, he found two on the right lateral pectoral area, two on the outer medial aspect of the right arm, one to the posterior left shoulder and two to the right middle finger. The parties further stipulated that on March 9, 2004, Journey was identified by his sister, Ms. Witcher, as the body was removed from the Schaefer Street apartment. (P 4-6).
>
> The People then called Derrick Steele ("Steele"), who testified that he knew both petitioner and Robert Ramsey ("Ramsey") from the neighborhood. He knew the decedent through his girlfriend, Brenda Mims ("Mims"), with whom Steele shared the Schaefer Street apartment. On March 9, 2004, according to Steele, Journey and Mims and others were at the apartment. Steele was watching television in the bedroom with a person named Mark when he heard a knock at the door. Steele heard Mims tell Journey to answer the door and heard Journey state that the person at the door was petitioner. Steele exited the bedroom and heard shots fired. He observed

6

petitioner holding a rifle and [Ramsey] holding a handgun. Steele returned to the bedroom, retrieved a rifle from the mattress and fired a number of shots. While firing, Steele did not see petitioner or Ramsey. When the shooting subsided, petitioner and Ramsey were gone. Journey was lying on the [floor,] by the door. (P 6-23).

Rasheem Mims ("Rasheem") testified that he is a cousin of Mims and Journey, and also [was] present at the apartment. He stated that he was in the kitchen when he heard a commotion at the door. He heard shooting and remained in the kitchen, where he could not see the door. Rasheem stated that he observed petitioner and Ramsey holding weapons, but did not see them shoot. (P 24-35).

Mims stated that she was sitting at the kitchen table when she heard a knock on the door. Journey was watching television near the door and she instructed him to see who was there. Mims heard Journey reply "Larry," [a]nd saw petitioner at the door holding a gun. Mims ran to the bedroom. As she ran, she heard more than thirty shots fired from the front room of the apartment. She hid in the closet and did not see Steele return fire. (P 36-45).

Petitioner was bound over to stand trial as charged. (P 45-46). On August 25, 2004, he appeared for trial along with codefendant Ramsey, a/k/a "Bo". Following preliminary matters, (T1 4-10), preliminary jury instructions (T1 11-16, 121-129), jury selection (T1 16-121) and opening statements (T1 130-156), the following testimony was presented:

Savilla Journey ("Savilla") stated that Journey was her 26-year-old son. On March 10, 2004, she identified his body at the office of the Wayne County Medical Examiner. (T1 158-160). Mims stated that on March 9, 2004, she [was] living at 16540 Schaefer, along with her boyfriend, Steele, her 24-year-old daughter, LaRhonda Mims ("LaRhonda"), her cousin, Rasheem, a friend, Mark McHenry ("McHenry"), and her godson, Journey. Mims and LaRhonda were in the kitchen. Journey was in the living room. Rasheem was in the hallway, Steele and McHenry were in the bedroom. She heard a knock on the door and asked Journey to see who was there. Journey opened the door. Mims observed petitioner holding a long gun. Rasheem ran to the kitchen. Mims and LaRhonda ran to the bedroom. Along the way, Mims heard gunfire. She told Steele to get his nine-millimeter rifle. She hid in the closet. After the shooting ended, Mims observed Journey laying on the living room floor bleeding. She was aware that Steele and McHenry sold marijuana from the apartment and that cash and marijuana had [been] taken in a robbery of the apartment the day before. She suspected that petitioner had been involved in the robbery. (T1 162-226).

Steele, a/k/a "Dee" stated that on March 9, 2004, he was living at 16540 Schaefer apartment with his girlfriend, Mims. Also present were Rasheem, a/k/a "Lorenzo Redmond a/k/a "Quadreek," LaRhonda, a/k/a "Roselyn Mims," McHenry and Journey. Steele was in the bedroom watching television with McHenry when he heard a knock at the door. As he went to the door, Mims and LaRhonda rushed in and told him to grab his gun. Steele saw Journey holding the entry door and [saw] petitioner with a rifle. Steele stated that he heard shots fired, got his nine-millimeter

rifle from under the mattress, loaded it and fired four or five rounds at Ramsey, who was about five feet from the bedroom door holding a handgun at his side. He then hid in the bedroom. When the shooting ended, he left the bedroom and saw Journey bleeding from his right shoulder and placed the gun in the closet. Steele stated that he was robbed of cash and marijuana at his apartment the day before, which prompted him to get the rifle from a person named "Mike," whose last name, address and telephone number where unknown and who charged him nothing. Steele stated that petitioner and Ramsey were not involved in the robbery and he had no problem with them before the day of the shooting. He acknowledged that he was selling marijuana from the apartment; that he was initially arrested for Journey's murder; and that he had earlier stated to the police and testified under oath that he had fired the gun so many times that he could not recall how many rounds he had discharged, and that he may [have] fired the shots which killed Journey. (T2 5-94).

Rasheem stated that he was alone in the kitchen when he heard a knock on the door and heard Mims tell Journey to answer the door. He then heard commotion and shots being fired from the front door. He remained in the kitchen to stay out of the line of fire. When the shooting subsided, he looked out [from] the kitchen and saw petitioner in the living room holding a rifle and Journey laying by the door bleeding. He did not see any weapons fire. He acknowledged providing the name Lorenzo Redmond to the police and to having a prior robbery conviction. (T2 95-136).

Detroit Police Officer Donald Rem ("Rem") stated that he and his partner, Officer Williams Niaehos ("Niaehos"), are evidence technicians. On March 10, 2004, they were dispatched to the location. After meeting with Homicide Section Officers Hardy and McMillian, they collected evidence, took photographs and prepared a sketch of the scene. Outside the building Rem noted two small stains of what appeared to be fresh blood. A sizeable pool of suspected blood was just inside the doorway. In the hallway outside the apartment, he observed damage consistent with bullet holes and recovered six 7.62 by 39 Wolf-fired cartridge casings and a cellular phone. In his opinion, the damage pattern indicated that the bullets were fired from within the hallway outside the building. Inside the apartment bedroom he located more suspected blood, along with five fired nine-millimeter casings and an undetermined caliber spent bullet recovered from a sofa. In the hallway were several bullet holes. Additional 7.62 by 39 fired cartridge casings were recovered in the living room. In his opinion, damage to the walls appeared to be caused by bullets, which traveled from the living room into the bedroom. From a shoe box in side the doorway he recovered thirteen plastic bags of marijuana, which weighed 120 grams. At the 12th Precinct, he performed a gunshot residue test on Steele. He did not perform any fingerprint dusting. (T2 141-229). Niarhos stated that he took photographs and described them to the jury. (T2 231-252; T3 5-24).

Police Officer Mary Gross ("Gross"), an evidence technician working in the Laser Unit, was recognized as an expert in laser fingerprint examination. She examined a number of fired nine-millimeter and 7.62 by 39 cartridge casings, a metal-jacketed bullet, nine-millimeter fired bullet and an ammunition clip. She could

not detect any readable latent fingerprints from any of the objects. (T3 25-40).

William Steiner ("Steiner") is a civilian employee of the Detroit Police Department working as a forensic chemist in the Crime Lab. He was recognized as an expert in serology, trace evidence and gunshot residue testing. Steiner examined a suspected blood sample recovered from the apartment bedroom, and concluded that it was not blood. He examined a sample recovered from the walk in front of the apartment building, determined that it was blood and stored it for DNA testing. He also received a known sample from Ramsey, which he also prepared for DNA testing. He examined the gunshot residue test taken from Steele. In his opinion, all four samples contained gunshot residue, indicating either that he fired a gun, was in close proximity to somebody else [that] fired a gun or handled a gun or some other object which had gunshot residue on it. (T3 42-61).

Paula Lytle ("Lytle") is a civilian employee of the Detroit Police Department. Lytle [who] manages the forensic laboratory of the Crime Lab, supervising the Forensic Biology, Trace Evidence Unit. Lytle was recognized as an expert in forensic serology and DNA. She stated that she received the blood sample taken from Ramsey and the blood sample taken from the walk in front of 16540 Schaefer. In her opinion, the two samples were inconsistent with each other. She did not received a sample of the decedent's blood and she could not compare the unknown sample with DNA data bank files because it was only a partial profile. (T3 62-68).

Detroit Police Officer Susan Smith ("Smith") works in the Firearms Identification Unit. She received a nine-millimeter rifle, a magazine containing three nine-millimeter full metal jacketed cartridges, five nine-millimeter fired cartridge casings, a nine-millimeter fired bullet, seventeen 7.62 by 39 Winchester fired cartridge casings and a .30 caliber metal jacketed bullet which were recovered from 16540 Schaefer. Smith concluded that the nine-millimeter casings were all fired from the nine-millimeter rifle; and that the 7.62 by 39 casings were all fired from the same weapon. The 7.62 by 39 caliber casings were compatible with the .30 caliber bullet, but neither is compatible with a nine-millimeter rifle. Without a weapon to test fire, she could not compare the .30 caliber bullet with the 7.62 by 39 caliber cartridge casings. (T3 69-79).

Detroit Police Officer Ollie McMillian ("McMillian") stated that he arrived with investigator Mamie Hardy ("Hardy"). McMillian surveyed the premises, took part in a search of the apartment, took witness statements and gave assignments to the evidence technicians. He was aware that a weapon and marijuana were found at the apartment, but that he did not recover the items himself. (T3 80-118). Hardy stated that she interviewed the tenants and obtained consent to search the apartment. (T3 119-122).

Detroit Police Officer Edward Brannock ("Brannock") and his partner, Officer Jason Pavivic ("Pavivic"), were the first unit to arrive on the scene. As they entered the building, two people exited the apartment buildings screaming that a man had been shot. Brannock ordered everybody out and placed them against a wall in the hall. A man was lying on the floor inside the doorway, bleeding and unresponsive. Brannock searched the unit to make sure nobody else was inside. He

then secured the scene until Homicide investigators and EMS technicians arrived. He spoke with other residents of the complex, but he did not enter any of the other units. He reported that Steele was arrested for murder. (T3 123-129, 152-169).

Chief Wayne County Medical Examiner Carl Schmidt ("Dr. Schmidt") was recognized as an expert in forensic pathology. Dr. Schmidt stated that he reviewed the report of the March 10, 2004 autopsy conducted by Assistant Medical Examiner Diaz on Journey. The report noted that the 27-year-old 6'1" 170 pound man received seven gunshot wounds. Specifically, two on the right side of the chest, which went through the organs of the chest and exited the back; two which perforated the right arm, one which went through the left shoulder and two to the right middle finger. There was evidence of a medical incision to the chest in an attempt to resuscitate him. The first two wounds were considered fatal. There was no stippling on the skin and no evidence of close range firing. Toxicology tests indicated a blood alcohol level on .16. There was no screening for marijuana. The cause of death was multiple gunshot wounds. The manner of death was homicide. (T3 130-151).

Detroit Police Officer Rick Fields is an evidence technician. At the request of Sergeant Myzell of the Homicide Section, he recovered a fired bullet by digging it out of a closet wall (T3 169-178).

Detroit Police Officer John Chaisson ("Chaisson") arrived with Pavivic. He assisted in obtaining witness information and preserving the scene. Chaisson placed Steele in his squad car to detain him as a witness. Other officers went to Grace Hospital to receive medical information about the decedent. While they were there, a person came to seek treatment for a gunshot wound sustained at the same location. About an hour later, when it was broadcast over the police radio that a second person had been shot, Steele informed Chaisson that [he had] "shot someone. I think I shot Bo." He was arrested for murder and transported to the 12th Precinct. (T3 180-193).

On March 11, 2004, Detroit Police Sergeant Matthew Gnatek, along with Officer Christopher Dean, went to petitioner's mother's house. They were told that he was at work. They proceeded to his place of work, where he was arrested without incident. (T3 194-199).

Detroit Police Officer Laron York ("York") stated that he arrived at the apartment with his partner, Shannon Bullock. The decedent was still present. He and his partner followed EMS to Sinai-Grace Hospital. While they were there, York learned that Ramsey was there for treatment of a gunshot wound. He was instructed to place Ramsey under arrest. Bullock took custody of Ramsey's property and they waited until Ramsey underwent surgery. (T3 201-205; 216-217).

Detroit Police Officer Jason Figurski stated that police reports indicated Steele was arrested for the willful killing of a non-family member involving a gun because the report[s] are computer generated and the program requires that response for all persons arrested in that incident. On cross examination, he acknowledged that petitioner's report indicated that he was arrested for a warrant or summons and that Ramsey's report indicated that he was the shooting victim. (T3 207-215).

Outside the presence of the jury, (c.f. T3 218), the prosecutor sought to strike witnesses LaRhonda and Melvin Burton ("Burton") from its witness list for the

reason that they could not be located. Their statements were read into the record. (T3 219-226). The efforts made to locate them were then recounted. The prosecutor stated that both he and Sergeant Paul Jones were advised by Burton's grandmother that Burton was out of state and were provided two Tennessee telephone numbers, which were dialed without success. The grandmother then advised them that he had moved to Atlanta. As for LaRhonda, they were advised by Mims and Steele that her whereabouts were unknown. (T4 226-228; T3 3-6). Sergeant Jones then testified as to his own personal efforts to locate the witnesses. (T4 228-233; T4 7-18). Over counsel's objections, (T4 19-26), the court ruled that the prosecution had exercised due diligence and permitted waiver of the witnesses. (T4 26-27). Following a jury instruction conference, (T4 28-35), the prosecutor called Detroit Police Officer Michael Jackson ("Jackson"), who testified that after leaving Apartment 4, he visited Apartment 8. The door was ajar and the television on, but he received no response. Jackson entered the unit, where he recovered [a] police citation and a bank statement bearing petitioner's name. (T4 39-44).

Def.-Appellant's Br. on App., in *People v. Jackson*, No. 258195 (Mich. Ct. App.), at 1-7.

C.    *Procedural Default*

Respondent first contends that several of petitioner's claims are barred by petitioner's procedural default in the state courts, because petitioner failed to raise these claims on direct appeal. The Court should disagree.

Under the procedural default doctrine, a federal habeas court will not review a question of federal law if the state court's decision rests on a substantive or procedural state law ground that is independent of the federal question and is adequate to support the judgment. *See Coleman v. Thompson*, 501 U.S. 722, 729 (1991). However, "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on the procedural bar." *Harris*, 489 U.S. at 263. Furthermore, "only a 'firmly established and regularly followed state practice' may be interposed by a State to prevent subsequent review . . . of a federal constitutional claim." *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991) (quoting *James v. Kentucky*, 466 U.S. 341, 348-51 (1984));

11

*see also*, *Calderon v. United States Dist. Ct. for the E. Dist. of Cal.*, 96 F.3d 1126, 1129 (9th Cir. 1996) (internal quotation omitted) ("For the procedural default doctrine to apply, a state rule must be clear, consistently applied, and well-established at the time of the petitioner's purported default.").

Here, petitioner first presented his purportedly defaulted habeas claims in his motion for relief from judgment. Michigan Court Rule 6.508, governing motions for relief from judgment, provides that the movant "bears the burden of establishing entitlement to relief." Mich. Ct. R. 6.508(D). The rule goes on to provide, in three separately numbered paragraphs, procedural situations in which relief will not be granted: (1) where an appeal relating to the conviction is pending; (2) where the claim has already been ruled upon in a prior appeal or postconviction motion; and (3) where the claim could have been raised in a prior appeal or postconviction motion but was not. *See* Mich. Ct. R. 6.508(D)(1)-(3). The Michigan Court of Appeals and the Michigan Supreme Court both rejected petitioner's appeal based on his "failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)." In *Simpson v. Jones*, 238 F.3d 399 (6th Cir. 2000), the court held that this identical language constitutes an invocation of the procedural aspects of Rule 6.508(D), and thus bars federal habeas review. *See Simpson*, 238 F.3d at 408. However the en banc Sixth Circuit has recently rejected this rule, holding that the form orders used by the Michigan courts constitute unexplained orders which are ambiguous as to whether a procedural bar is being invoked, and thus a federal habeas court must "look through" these orders to the last reasoned state court judgment to determine if the claims are barred. *See Guilmette v. Howes*, 624 F.3d 286, 291-92 (6th Cir. 2010) (en banc).

Looking through the appellate court orders, it is clear that the trial court resolved petitioner's

12

claims on the merits, and did not invoke the procedural bar of Rule 6.508(D)(3).  The trial court neither cited that rule, nor discussed any aspect of the rule such as the cause and prejudice test contained within the Rule.  Rather, with respect to each claim, the trial court considered the merits of the issue, concluding that the claims were without merit as a substantive matter.  *See* MRJ Order. Accordingly, the Court should conclude that petitioner's claims are not barred by a procedural default.

Further, even were the Court to conclude that petitioner's claims are procedurally defaulted, it is still necessary to consider the claims on the merits.  As noted above, petitioner can still have his defaulted claims reviewed on the merits if he can show cause for, and prejudice attributable to, his default in the state courts.  Petitioner contends that his appellate counsel was ineffective for failing to raise these claims on direct appeal.  If petitioner's position is correct, counsel's ineffectiveness may constitute cause to excuse any procedural default.  *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  To demonstrate that appellate counsel was ineffective petitioner must show, *inter alia*, that his claims would have succeeded on appeal. *See Smith v. Robbins*, 528 U.S. 259, 285-86 (2000); *McCleese v. United States*, 75 F.3d 1174, 1180 (7th Cir. 1996).  Given that the cause and prejudice inquiry merges with an analysis of the merits of petitioner's defaulted claims, it is better to simply consider the merits of these claims, even if they are defaulted.  *See Jamison v. Collins*, 100 F. Supp. 2d 647, 676 (S.D. Ohio 2000); *Watkins v. Miller*, 92 F. Supp. 2d 824, 832 (S.D. Ind. 2000); *cf. Strickler v. Greene*, 527 U.S. 263, 282 (1999) (considering merits of petitioner's habeas claims where inquiry into the merits mirrored cause and prejudice inquiry).

D.    *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694.

14

However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous.  The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court."  Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence."  *Williams*, 529 U.S. at 412.  Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.'  In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16.  Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue.  *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D.

15

Mich. 2002) (Tarnow, J.).

E.     *Weight and Sufficiency of the Evidence and Innocence (Claims I, V, and VI)*

In his first claim, petitioner contends that the prosecution presented insufficient evidence to prove his guilt beyond a reasonable doubt.  Relatedly, in his fifth claim and sixth claims, he contends that he is entitled to a new trial because he is actually innocent or because his conviction was against the weight of the evidence.  The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.     *Weight of the Evidence (Claim VI)*

In his sixth habeas claim, petitioner contends that the verdict was against the weight of the evidence, and that he should have been granted a new trial on this basis.  This claim is not cognizable on habeas review.  The federal constitution requires only that the evidence be sufficient to sustain the conviction under the standard established in *Jackson v. Virginia, infra*.  Where the evidence is sufficient as a matter of due process, a claim that the verdict was against the weight of the evidence presents a state law issue which is not cognizable on habeas review.  *See Douglas v. Hendricks*, 236 F. Supp. 2d 412, 435-36 (D.N.J. 2002); *Dell v. Straub*, 194 F. Supp. 2d 629, 648 (E.D. Mich. 2002) (Friedman, J.); *Correa v. Duncan*, 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001); *cf. Tibbs v. Florida*, 457 U.S. 31, 44 (1982) (noting in a different context that "trial and appellate judges commonly distinguish between weight and sufficiency of the evidence.").  In short, "[a] federal habeas court has no power to grant habeas corpus relief because it finds that the state conviction is against the 'weight of the evidence.'"  *Young v. Kemp*, 760 F.2d 1097, 1105 (11th Cir. 1985).

2.     *Sufficiency of the Evidence (Claim I)*

16

Petitioner next contends that the prosecution presented insufficient evidence to prove his guilt beyond a reasonable doubt.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

### a.  Clearly Established Law

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970).  Under the pre-AEDPA standard for habeas review of sufficiency of the evidence challenges, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).  Reviewing courts must view the evidence, draw inferences and resolve conflicting inferences from the record in favor of the prosecution.  *See Neal v. Morris*, 972 F.2d 675, 678 (6th Cir. 1992).  In determining the sufficiency of the evidence, the court must give circumstantial evidence the same weight as direct evidence.  *See United States v. Farley*, 2 F.3d 645, 650 (6th Cir. 1993).  However, under the amended version of § 2254(d)(1) a federal habeas court must apply a more deferential standard of review of the state court decision.  Thus, the question here is whether the Michigan Court of Appeals's application of the *Jackson* standard was reasonable. *See Gomez v. Acevedo*, 106 F.3d 192, 198-200 (7th Cir. 1997), *vacated on other grounds sub nom. Gomez v. DeTella*, 522 U.S. 801 (1998); *Restrepo v. DiPaolo*, 1 F. Supp. 2d 103, 106 (D. Mass 1998).

While a challenge to the sufficiency of the evidence on an established element of an offense raises a federal constitutional claim cognizable in a habeas corpus proceeding, *see Jackson*, 443 U.S.

17

at 324, "[t]he applicability of the reasonable doubt standard . . . has always been dependent on how a State defines the offense that is charged in any given case." *Patterson v. New York*, 432 U.S. 197, 211 n.12 (1977); *see also*, *Jackson*, 443 U.S. at 324 n.16; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). Thus, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999).

Under Michigan law, the common law crime of murder is defined as second-degree murder, and is punishable by up to life imprisonment. *See* MICH. COMP. LAWS § 750.317. To establish second-degree murder, the prosecution must show that the defendant killed a human being with malice aforethought. In order to show malice aforethought, the prosecution must establish one of three mental states on the part of the defendant at the time of the killing: (1) intent to kill; (2) intent to commit great bodily harm; or (3) intent to create a very high risk of death or great bodily harm with the knowledge that death or great bodily harm is the probable result. *See People v. Dykhouse*, 418 Mich. 488, 495, 345 N.W.2d 150, 151 (1984); *People v. Aaron*, 409 Mich. 672, 713-14, 299 N.W.2d 304, 319-20 (1980). Certain additional elements elevate second-degree murder to first-degree murder, which is punishable by a mandatory term of nonparoleable life imprisonment. Specifically, under Michigan law, first-degree murder includes any "[m]urder perpetrated by means of poison, lying in wait, or any other willful, deliberate, and premeditated killing." MICH. COMP. LAWS § 750.316(1). Thus, "[i]n order to convict a defendant of first-degree murder, the prosecution must prove that the defendant intentionally killed the victim and that the act of killing was premeditated and deliberate." *People v. Anderson*, 209 Mich. App. 527, 537, 531 N.W.2d 780, 786 (1995); *see also*, *Grant v. Rivers*, 920 F. Supp. 769, 786 (E.D. Mich. 1996); *People v. Younger*, 380 Mich. 678, 681, 158 N.W.2d 493, 495 (1968); *People v. Brown*, 137 Mich. App. 396, 407, 358

18

N.W.2d 592, 597 (1984).  Further, it is well established that both intent to kill and "premeditation

and deliberation may be inferred from the circumstances surrounding the killing."  *People v. Ortiz-*

*Kehoe*, 237 Mich. App. 508, 520, 603 N.W.2d 809 (1999); *accord Warren v. Smith*, 161 F.3d 358,

361 (6th Cir. 1998); *People v. McRunels*, 237 Mich. App. 168, 181, 603 N.W.2d 95, 102 (1999).

### b.  Analysis

Petitioner contends that the evidence presented at trial was insufficient to establish both that

he shot the victim, and that he acted with premeditation and deliberation.  With respect to the

identity issue, the Michigan Court of Appeals rejected petitioner's claim, reasoning:

> In this case, decedent, unarmed, answered the door to the apartment. Two witnesses
> saw defendant in the living room with a rifle. According to one of them, the rifle was
> pointed at decedent. Soon after decedent opened the door, shooting started in the
> living room. The fired casings, the police found in the living room, most likely came
> from an assault rifle. Those casings were all fired from the same weapon. A witness
> also observed codefendant in the apartment, but codefendant was armed with a
> handgun, not a rifle. A third witness observed defendant in the living room with a
> rifle after the shooting stopped. Decedent was found bleeding by the door that he had
> opened for defendant. Viewing the evidence in a light most favorable to the
> prosecution, we conclude that sufficient evidence was presented to support the
> finding that defendant killed decedent.

*Jackson*, 2006 WL 66682, at *1.  This determination was reasonable.

Petitioner contends that the evidence was insufficient because Steele admitted that he may

have fired the shots that killed the victim, and because the evidence established that the victim was

shot by two different guns.  There was significant eyewitness testimony implicating petitioner.  All

of the witnesses testified that petitioner arrived at the door armed with a rifle and that shots were

then fired.  Although there was evidence that Steele also fired a gun, the firearms expert testified that

the numerous 7.62 x 39 caliber casings found at the scene were inconsistent with Steele's 9mm rifle.

The evidence showed that the 9mm casings were found in or near the bedroom, supporting Steele's

19

testimony that he fired at petitioner's codefendant.  Further, several of the 7.62 x 39 caliber casings were found in the hallway directly outside the door, supporting the theory that petitioner shot the victim right after he opened the door.  From the eyewitness testimony about petitioner's actions and the locations of the spent casings, the jury could conclude beyond a reasonable doubt that it was petitioner who shot and fatally wounded the victim.  Thus, the Michigan Court of Appeals's rejection of petitioner's claim was not unreasonable.

Likewise, the Michigan Court of Appeals rejected petitioner's claim that the evidence was insufficient to establish premeditation:

> In this case, defendant knew the people with decedent when he was shot, but there is nothing in the record to suggest that defendant had any problems with decedent or would want to kill him. Defendant did, however, come to the apartment with a rifle and, almost immediately, started shooting. Decedent was shot seven times, but it is possible that some of those wounds may have been from another gun. Decedent was found by the door that he had opened for defendant. After the shooting, defendant left decedent bleeding on the ground. Defendant was arrested at his work without incident. Viewing the above evidence in a light most favorable to the prosecution, we conclude that there was sufficient evidence presented for a rational trier of fact to conclude that defendant premeditated before killing decedent.

*Jackson*, 2006 WL 66682, at *1.  This determination was reasonable.  The evidence presented from the eyewitnesses, if believed by the jury, established that petitioner arrived at the apartment with a loaded rifle.  After the victim opened the door, petitioner began firing.  In total, the police recovered 17 of the 7.62 x 39 caliber casings.  Given this sequence of events and the number of shots fired, the Michigan Court of Appeals was not unreasonable in concluding that a rational jury could find beyond a reasonable doubt that petitioner premeditated the killing.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

3.      *Innocence (Claim V)*

In his fifth claim, petitioner contends that he is entitled to a new trial based on his innocence.

20

This claim is not cognizable on habeas review.  A writ of habeas corpus may be granted "only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Thus, the existence of new evidence, standing alone, is not a basis for granting the writ.  As the Supreme Court has explained: "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."  *Herrera v. Collins*, 506 U.S. 390, 400 (1993); *see also*, *id*. at 404 (claim of actual innocence is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise [procedurally] barred *constitutional* claim considered on the merits.") (emphasis added); *Schlup v. Delo*, 513 U.S. 298, 314-16 (distinguishing, in part, *Herrera* because in this case the petitioner "accompanie[d] his claim of innocence with an assertion of constitutional error at trial."); *Townsend v. Sain*, 372 U.S. 293, 317 (1963) ("Of course, such evidence must bear upon the constitutionality of the applicant's detention; the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus."), *overruled in part on other grounds*, *Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992).  Thus, the newly discovered evidence, standing alone, provides no basis for habeas relief.

Further, petitioner's evidence falls far short of that necessary to establish that he is innocent.  In *Herrera*, without elaborating further, the Court noted that even if a free-standing claim of innocence were cognizable on habeas review, "the threshold showing for such an assumed right would necessarily be extraordinarily high."  *Herrera*, 506 U.S. at 417.  In *Schlup*, the Court elaborated on the showing required to establish "actual innocence" for purposes of overcoming a procedural bar to consideration of a constitutional claim.  The Court explained that, to establish

actual innocence, the petitioner must "show that a constitutional violation has probably resulted in the conviction of one who is actually innocent. To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Schulup*, 513 U.S. at 327 (internal citation and quotation omitted).

The Supreme Court has also explained that a petitioner cannot establish his actual innocence merely be rehashing his innocence claims raised in the state courts and relying on the evidence adduced at trial. If he could, federal habeas review would become nothing more than a second trial on the merits, something the Supreme Court has repeatedly admonished the federal courts to avoid. *See Milton v. Wainwright*, 407 U.S. 371, 377 (1972) ("The writ of habeas corpus has limited scope; the federal courts do not sit to re-try state cases *de novo*[.]"). Thus, "to be credible, [a claim of actual innocence] requires petitioner to support his allegations of constitutional error with new reliable evidence that was not presented at trial." *Schlup*, 513 U.S. at 324. "Examples of evidence which may establish factual innocence include credible declarations of guilt by another, trustworthy eyewitness accounts, and exculpatory scientific evidence." *Pitts v. Norris*, 85 F.3d 348, 350-51 (8th Cir. 1996) (citations omitted); *accord Schlup*, 513 U.S. at 324 (referring to "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence").

Here, petitioner does not point to any new, reliable evidence of innocence. Rather, petitioner's actual innocence argument essentially rehashes the ballistics and bullet trajectory evidence at trial, evidence which was already considered by the jury. Petitioner also claims that there was no evidence of close range firing because there was no stippling on the victim, a fact which was also presented to the jury. And in any event, the absence of stippling does not preclude

22

a finding that petitioner fired at the victim from the hallway.  Stippling occurs only when the muzzle of the gun is fired less than two feet away from the victim.  *See Turner v. Johnson*, 106 F.3d 1178, 1182 n.1 (5th Cir. 1997); *Colon v. Smith*, 723 F. Supp. 1003, 1006 (S.D.N.Y. 1989); J. Scott Denton, et al., *Practical Pathology of Gunshot Wounds*, ARCHIVES OF PATHOLOGY & LABORATORY MEDICINE, Sept. 2006, at 1283 (available online at www.archivesofpathology.org).  Thus, the absence of stippling on the victim does not preclude petitioner from having shot the victim while standing in the hall.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.    *Due Diligence (Claim II)*

Petitioner also argues that the prosecutor failed to exercise due diligence in attempting to produce two endorsed witnesses—Roselyn Mims and Melvin Burton—and therefore the trial court erred in denying petitioner's request for a missing witness instruction.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

Petitioner's claim that the trial court erred in failing to give a missing witness instruction is not cognizable on habeas review.  It is true that, at the time of petitioner's trial, Michigan law required a prosecutor to list all *res gestae* witnesses.  *See* MICH. COMP. LAWS §§ 767.40-.40a; *see also*, *People v. Jones*, 641 Mich. App. 659, 236 N.W.2d 531 (1975); *People v. Anderson*, 64 Mich. App. 218, 235 N.W.2d 746 (1975).  Under Michigan law, a *res gestae* witness is "one who was an eyewitness to some event in the continuum of a criminal transaction and whose testimony will aid in developing a full disclosure of the facts surrounding the alleged commission of the charged offense."  *People v. Hadley*, 67 Mich. App. 688, 690, 242 N.W.2d 32, 34 (1976).  The statute does not, however, require the prosecutor to call all listed witnesses.  In any event, any failure of the

prosecutor with respect to a *res gestae* witness raises solely a claim of state law.  It is well established that errors of state law do not provide a basis for habeas relief.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").  Thus, petitioner's claim that the prosecutor violated state law regarding the production of *res gestae* witnesses is not cognizable on habeas review.  *See Johnson v. Hofbauer*, 159 F. Supp. 2d 585, 601 (E.D. Mich. 2001) (Tarnow, J.).  Further, the court of appeals concluded as a matter of state law that the prosecution had exercised due diligence in attempting to locate these witnesses, *see Jackson*, 2006 WL 66682, at *2-*3, and thus petitioner was not entitled to a missing witness instruction under state law.  Because he was not entitled to such an instruction under state law, the failure of the trial court to give the instruction did not deprive petitioner of a fair trial.  *See Thomas v. Lecureux*, 8 Fed. Appx. 461, 464-65 (6th Cir. 2001).  Accordingly, petitioner is not entitled to habeas relief on this claim.

G.   *Prosecutorial Misconduct (Claim VII)*

Petitioner next contends that he was denied a fair trial by several instances of prosecutorial misconduct.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.   *Clearly Established Law*

For habeas relief to be warranted on the basis of prosecutorial misconduct, it is not enough that the prosecutor's conduct was "undesirable or even universally condemned."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  Rather, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Id.* (internal quotation omitted).  "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor."  *Smith v. Phillips*, 455 U.S. 209, 219 (1982).  In determining whether the

24

prosecutor's conduct was so egregious as to warrant habeas relief, a court should consider "the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury; and the strength of the competent proof to establish the guilt of the accused." *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (internal quotations and citations omitted). In sum, to constitute a denial of due process the prosecutor's conduct must be "so pronounced and persistent that it permeates the entire atmosphere of the trial." *Id.* (internal quotation omitted).

2. *Analysis*

Petitioner contends that the prosecutor committed misconduct by his asserting that blood found outside the apartment likely came from the deceased. In context, there was nothing improper with this argument. During closing argument, defense counsel suggested that the police had done a poor job investigating, in part because they never tested blood found outside the apartment to see who it belonged to, other than petitioner's codefendant. *See* Trial Tr., dated 8/31/04, at 73-74. The prosecutor responded during rebuttal that, "Sure it would be nice to know who that pool of blood out in the walkway belonged to. But it likely belonged to Keith Journey as he was being taken out to the . . ." *Id.* at 102-03. While it is true that there was no evidence that the blood belonged to the victim, the prosecutor did not suggest that there was such evidence. Rather, the prosecutor merely offered an innocent, common sense explanation for the blood in response to defense counsel's argument. This was permissible. *See Darden v. Wainwright*, 477 U.S. 168, 182 (1986) (one factor in evaluating claims of prosecutorial misconduct is whether the prosecutor's statements were "invited by or was responsive" to the defense.); *United States v. Catano*, 65 F.3d 219, 228 (1st Cir. 1995) (prosecutor may argue that the jury should use its common sense in evaluating the evidence).

25

Further, petitioner cannot show how this brief comment deprived him of a fair trial. Defense counsel immediately objected to the statement, and the prosecutor did not mention the matter again. Even if the prosecutor's statement was improper, it was an isolated error on a tangential matter, and thus did not deprive petitioner of a fair trial.

Petitioner also contends that he was denied a fair trial by the prosecutor's statement that "you don't expect people to keep guns after a robbery or murder." This statement, responsive to defense counsel's argument based on the failure of the police to find a gun on petitioner, was again a proper call for the jury to use its common sense in evaluating the evidence, and thus was not improper. *See Catano*, 65 F.3d at 228; *United States ex rel. Hamilton v. Ellingsworth*, 629 F. Supp. 356, 366 (D. Del. 1998).

Finally, petitioner contends that the prosecutor committed misconduct by eliciting from Steele testimony that petitioner had admitted to Steele that he was responsible for the bullet holes in the plexiglass window. However, this evidence was admissible against petitioner as an admission of a party opponent. *See* Mich. R. Evid. 801(d)(2); MRJ Order, at 3-4. Thus, the prosecutor did not commit misconduct by introducing this evidence at trial. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on his prosecutorial misconduct claims.

H.     *Ineffective Assistance of Counsel (Claims III & IV)*

Petitioner next claims that his trial and appellate counsel were ineffective in a number of respects. In Claim III, he contends that trial counsel was ineffective for failing to: (1) present his alibi defense; (2) obtain blood tests; (3) object to hearsay; (4) object to the testimony of the pathologist; and (5) argue to the jury that he could not have killed the victim because the weapon petitioner was alleged to have fired was only fired into the bedroom, and not at the front door. In

Claim IV, petitioner contends that his appellate counsel was ineffective for failing to raise his motion for relief from judgment claims on direct appeal. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.       *Clearly Established Law*

The Sixth Amendment right to counsel and the right to effective assistance of counsel protect the fundamental right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *Id*. at 687. These two components are mixed questions of law and fact. *Id*. at 698. Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.* With respect to the performance prong of the *Strickland* test, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id*. at 689; *see also O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690. With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would

27

have had a reasonable doubt respecting guilt." *Id*. at 695.  It is petitioner's burden to establish the

elements of his ineffective assistance of counsel claim.  *See United States v. Pierce*, 63 F.3d 818,

833 (6th Cir. 1995) (petitioner bears the burden of establishing counsel's ineffectiveness); *Lewis v.*

*Alexander*, 11 F.3d 1349, 1352 (6th Cir. 1993) (same).

As the Supreme Court has recently explained, *Strickland* establishes a high burden that is

difficult to meet, made more so when the deference required by § 2254(d)(1) is applied to review

a state court's application of *Strickland*:

> "Surmounting Strickland's high bar is never an easy task." *Padilla v.*
> *Kentucky*, 559 U.S. ----, ----, 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010). An
> ineffective-assistance claim can function as a way to escape rules of waiver and
> forfeiture and raise issues not presented at trial, and so the Strickland standard must
> be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the
> integrity of the very adversary process the right to counsel is meant to serve.
> *Strickland*, 466 U.S., at 689-690, 104 S.Ct. 2052. Even under *de novo* review, the
> standard for judging counsel's representation is a most deferential one. Unlike a later
> reviewing court, the attorney observed the relevant proceedings, knew of materials
> outside the record, and interacted with the client, with opposing counsel, and with
> the judge. It is "all too tempting" to "second-guess counsel's assistance after
> conviction or adverse sentence." *Id*., at 689, 104 S.Ct. 2052; *see also Bell v. Cone*,
> 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Lockhart v. Fretwell*,
> 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The question is whether
> an attorney's representation amounted to incompetence under "prevailing
> professional norms," not whether it deviated from best practices or most common
> custom. *Strickland*, 466 U.S., at 690, 104 S.Ct. 2052.
>      Establishing that a state court's application of *Strickland* was unreasonable
> under § 2254(d) is all the more difficult. The standards created by *Strickland* and §
> 2254(d) are both "highly deferential," *id*., at 689, 104 S.Ct. 2052; *Lindh v. Murphy*,
> 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two
> apply in tandem, review is "doubly" so, *Knowles*, 556 U.S., at ----, 129 S.Ct. at 1420.
> The *Strickland* standard is a general one, so the range of reasonable applications is
> substantial. 556 U.S., at ----, 129 S.Ct. at 1420 . Federal habeas courts must guard
> against the danger of equating unreasonableness under *Strickland* with
> unreasonableness under § 2254(d). When § 2254(d) applies, the question is not
> whether counsel's actions were reasonable. The question is whether there is any
> reasonable argument that counsel satisfied Strickland's deferential standard.

*Harrington v. Richter*, 131 S. Ct. 770, 788 (2011).

2.    *Trial Counsel*

*a. Failure to Present Alibi*

Petitioner first contends that trial counsel was ineffective for failing to present his alibi defense at trial.  At the evidentiary hearing, petitioner presented four alibi witnesses who he claimed counsel should have called at trial.  Noreen Beatty, petitioner's grandmother, testified that petitioner arrived at her apartment between 10:00 and 10:20 p.m. on the night of murder, and left sometime between 10:40 and 11:00 p.m.  Vanessa Beatty, petitioner's mother, testified that petitioner was at the apartment from 10:35 p.m. to sometime between 12:00 and 12:30 a.m.  Danielle McDonald, petitioner's sister, testified that she played cards with petitioner at her grandmother's apartment, but did not testify as to the time that petitioner arrived at or left the apartment.  Finally, Chad Wheeler, petitioner's cousin, testified that he and petitioner worked at Fitness USA Gym until 10:00 p.m., and then went to their grandmother's apartment.  He did not recall how long he stayed in the apartment, or if petitioner left at the same time he did, but they both ended up in Wheeler's apartment, which was across the hall from their grandmother's apartment.  *See* New Trial Order, at 3-4.

Richard Cunningham, who represented petitioner at trial, testified that petitioner told him he was at the crime scene but did not have a gun.  For this reason, he did not pursue an alibi defense. Further, Mr. Cunningham's notes reflected that petitioner's mother had called and suggested he try to obtain a plea deal of 10-15 years' imprisonment in exchange for petitioner's testimony about the real shooters, suggesting that petitioner was present at the time of the shooting.  *See id*. at 4-5. Stephen Toia, who was retained by petitioner's mother and who preceded Mr. Cunningham's representation, testified that he filed a notice of alibi based on information given to him by petitioner's mother.  However, petitioner told Mr. Toia that he was at the scene and that he

29

witnessed the gun battle.  Based on this information, Mr. Toia spoke with the prosecutor about a

plea, but petitioner was not interested in pleading unless the minimum sentence was 15 years.  *See*

*id*. at 5-6.

Finally, Jonathan Simon, petitioner's appointed appellate counsel, testified that petitioner

indicated in a letter that he wanted to call witnesses and testify, but that Mr. Cunningham had told

him that this was a bad idea.  Petitioner did not indicate that these were alibi witnesses, nor did he

assert that he was not at the scene.  Mr. Simon advised petitioner of his ability to file a *pro se*

supplemental brief, but petitioner did not file such a brief.  *See id*. at 6-7.

Based on the testimony presented at the hearing, the trial court rejected petitioner's claim.

The court reasoned that

> Mr. Toia, Mr. Cunningham and Mr. Simon each testified that the defendant advised
> them that he was present at the scene of this crime.  These attorneys do not know
> each other and did not discuss this case with each other during the trial and appellate
> proceedings or prior to their testimony at this hearing.  This court has no reason to
> doubt their individual, independent sworn testimony that the defendant told them that
> he was at the scene of the crime.
> 
> Likewise, these three attorneys have no reason whatsoever to falsely claim
> that the defendant admitted his presence at the scene when, in fact, he did not say it.
> Any criminal defense attorney would always rather have witnesses to the presence
> of the defendant at a place other than the crime scene.  Any witnesses, even family
> and friends, are always better than having no witnesses.

*Id*. at 7-8.  The court also noted that "various events throughout the proceedings tend to corroborate

their testimony," notably the actions of Toia and Cunningham in trying to secure a plea deal and the

issues raised by Simon on appeal.  *See id*. at 8-9.  Finally, the trial court also concluded that

petitioner was not prejudiced.  The court reasoned that petitioner did

> not have an alibi defense in this case because only the defendant's mother testified
> that he was at his grandmother's house from 10:20 until after midnight.  His
> grandmother testified that he left at 10:40 and the other witnesses did not recall what
> time he left.  He could have left his grandmother's home at any time until about

10:55 and still been at the crime scene by 11:00, which is about 1.3 miles from his grandmother's home.

*Id*. at 9.  This determination was reasonable.

The trial court found, as a factual matter, that petitioner's trial attorneys testified truthfully when they testified that petitioner told them he was at the scene of the crime at the time of the murder.  This determination was reasonable in light of the state court record, *see* 28 U.S.C. § 2254(d)(2), and petitioner has not presented any clear and convincing evidence to rebut the trial court's factual findings, *see* 28 U.S.C. § 2254(e)(1).  And in light of these factual findings, counsel did not perform deficiently by failing to present an alibi defense that contradicted petitioner's own statements regarding his presence at the scene.  As explained in *Strickland*, "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions."  *Strickland*, 466 U.S. at 691.  Further, in the context of an ineffective assistance of counsel claim, "an attorney's ethical duty to advance the interest of his client is limited by an equally solemn duty to comply with the law and standards of professional conduct."  *Nix v. Whiteside*, 475 U.S. 157, 168 (1986).  Thus, where, as here, "counsel's failure to present testimony was motivated by a belief that an ethical obligation precluded him from doing so and that belief was reasonable, then such conduct may not be considered deficient performance[.]" *Card v. Dugger*, 911 F.2d 1494, 1503 (11th Cir. 1990).  Thus, counsel was not deficient in failing to present alibi testimony which counsel believed, in light of petitioner's own representations, would have amounted to perjury.

Likewise, the trial court's conclusion that petitioner was not prejudiced by counsel's failure to present an alibi defense was reasonable.  As the trial court noted, two of the four alibi witnesses could not or did not testify about the times at which petitioner was at his grandmother's apartment,

31

thus providing no alibi.  And although petitioner's mother did testify that petitioner was at the apartment at the time of the crime, his grandmother's testimony was to the contrary, indicating that petitioner had left by 10:40 p.m., sufficiently before the crime that it would not have provided him an alibi.  Because petitioner's mother had a strong motive to fabricate an alibi defense on petitioner's behalf, her "testimony would not have been particularly compelling and would have been subjected to vigorous impeachment," *Ball v. United States,* 271 Fed. Appx. 880, 884 (11th Cir. 2008); *see also*, *United States ex. rel. Emerson v. Gramley,* 883 F. Supp. 225, 236-37 (N.D. Ill. 1995)(counsel not ineffective in failing to call petitioner's mother and ex-wife as alibi witnesses, because they were "patently interested witnesses" who would have added little value to the case), particularly in light of the contrary testimony of petitioner's grandmother.  It is unlikely that the jury's assessment of the evidence would have changed had counsel presented testimony from four family members, only one of whom provided petitioner an alibi and one of whom directly contradicted that alibi.  Thus, the trial court's conclusions that counsel was not deficient in failing to present an alibi defense and that petitioner was not prejudiced by counsel's failure to do so were reasonable, and petitioner is not entitled to habeas relief on this claim.

### b.  Failure to Obtain Blood Test

Petitioner next contends that his counsel was ineffective for failing to obtain a blood test once he learned that someone else was at the scene of the crime.  Although petitioner lists this as a basis for ineffectiveness in his statement of the claim, petitioner provides no argument with respect to this claim in his original petition, amended petition, or reply brief.  Nor did petitioner present any such argument in any of his state court briefs.  Presumably, petitioner's claim relates to the unidentified blood found outside of the apartment, which the prosecution tested against petitioner's

codefendant but no one else.  The existence of this blood pool, however, does not establish that another person was present, nor has petitioner suggested any one against whose blood this blood might have been tested by counsel.  And counsel did argue that the prosecution's failure to test this blood demonstrated, along with other alleged police errors, that the police investigation was not properly completed.  Thus, petitioner has failed to demonstrate that counsel was ineffective for failing to secure a blood test.

### c.  Failure to Object to Hearsay and Pathologist Testimony

Petitioner next claims that trial counsel was ineffective for failing to object to hearsay evidence used at trial.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.  Specifically, petitioner points to Steele's testimony that petitioner admitted to being the one who shot at the plexiglass window, and to the testimony of the medical examiner who did not conduct the autopsy, but testified based on his review of the autopsy report.  With respect to the Steele testimony, the trial court concluded that the testimony was admissible as an admission of a party opponent under Rule 801(d)(2).  *See* MRJ Order, at 3.  With respect to the medical examiner's testimony, the trial court determined that because unlike other laboratory reports autopsy reports are prepared pursuant to a statutory directive, they are admissible under the business records exception to the hearsay rule.  *See id*. at 4 (citing MICH. COMP. LAWS §§ 52.202(1)(a), .207; MICH. R. EVID. 803(6), (8)).  In analyzing petitioner's ineffective assistance of counsel claims, these expressions of state law is binding on this Court. *See Basile v. Bowersox*, 125 F. Supp. 2d 930, 960 (E.D. Mo. 1999). *See generally*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Sarausad v. Porter*, 503 F.3d 822, 824 (9th Cir. 2007) ("A determination of state law by a state appellate court is … binding in a federal habeas action.").  Because this evidence was admissible as a matter of state law, counsel

33

was not ineffective for failing to raise a meritless objection.

Petitioner's reply brief suggests that counsel was ineffective for failing to object to the medical examiner testimony on confrontation grounds. The Court should conclude that counsel was not ineffective for failing to object on this basis. Until shortly before petitioner's trial, the standard governing the admissibility of hearsay statements under the Confrontation Clause was that set forth in *Ohio v. Roberts*, 448 U.S. 56 (1980). In *Roberts*, the Court explained that the underlying purpose of the Confrontation Clause is similar to that of the hearsay rule, *i.e.*, to exclude unreliable, out-of-court statements in criminal proceedings. Thus, the Court reasoned:

> In sum, when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

*Roberts*, 448 U.S. at 66. As the Court explained in *Roberts*, reliability is inferred if the evidence was admitted pursuant to a firmly rooted hearsay exception. The theory behind this presumption is that these firmly rooted exceptions represent judgments, based on history and practice, that statements made in certain circumstances are inherently trustworthy such that the "adversarial testing [embodied in the Confrontation Clause] would add little to [their] reliability." *Idaho v. Wright*, 497 U.S. 805, 821 (1990). Thus, a hearsay exception is "firmly rooted" if it "rest[s] upon such solid foundations that admission of virtually any evidence within [the exception] comports with the substance of constitutional protection." *Roberts*, 448 U.S. at 66 (internal quotation omitted). Thus,

In *Crawford v. Washington*, 541 U.S. 36 (2004), decided shortly after petitioner's trial, the

34

Supreme Court abrogated *Roberts* as applied to testimonial hearsay statements. After surveying the historical development of the Confrontation Clause and the jurisprudence interpreting it, the Supreme Court concluded that, under a proper understanding of the Clause, "[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Crawford*, 541 U.S. at 59. The Court then explained that *Roberts*'s allowance of testimonial statements based on their reliability, where there has been no opportunity for cross-examination of the declarant, departed from this proper understanding of the Confrontation Clause. *See id*. at 60-68. The Court therefore abrogated *Roberts* as applied to testimonial hearsay statements, concluding that "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id*. at 68-69. In *Crawford*, the Supreme Court left "for another day any effort to spell out a comprehensive definition of 'testimonial.'" *Crawford*, 541 U.S. at 68. The Court did, however, provide some guidance. Specifically, the Court provided three possible "formulations of th[e] core class of 'testimonial' statements":

> [1] *ex parte* in-court testimony or its functional equivalent–that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; [2] extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; [and] [3] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

*Id*. at 51-52 (internal quotations and citations omitted).

It is now clear that, under *Crawford*, the autopsy report was inadmissible under *Crawford*. *See Melendez-Diaz v. Massachusetts*, 129 S. Ct. 2527, 2532 (2009). It is less clear whether the

35

testimony of the medical examiner, who was subject to cross examination, based on the autopsy report prepared by another examiner was likewise improper. *Compare United States v. De La Cruz*, 514 F.3d 121, 133 (1st Cir. 2008), *cert. denied*, 129 S. Ct. 2858 (2009), *with United States v. Williams*, 740 F. Supp. 2d 4, 8 (D.D.C. 2010). In any event, at the time of petitioner's trial, which was shortly after *Crawford* and well before *Melendez-Diaz*, it was far from clear that autopsy and other laboratory reports constituted testimonial evidence under *Crawford*. On the contrary, until *Melendez-Diaz* "every court that ha[d] decided the issue since *Crawford* ha[d] held that" autopsy reports are not testimonial. Carolyn Zabrycki, Comment, *Toward a Definition of "Testimonial": How Autopsy Report Do Not Embody the Qualities of a Testimonial Statement*, 96 CAL. L. REV. 1093, 1094 (2008). This was the view of both the federal courts, *see, e.g.*, *De La Cruz*, 514 F.3d at 133; *United States v. Feliz*, 467 F.3d 227, 235 (2d Cir. 2006), and the Michigan courts, *see, e.g.*, *People v. Lewis*, No. 274508, 2008 WL 1733718, at *4 (Mich. Ct. App. Apr. 15, 2008), *vacated and remanded for reconsideration in light of Melendez-Diaz*, 485 Mich. 878, 772 N.W.2d 47 (2009), *opinion on remand*, 287 Mich. App. 356, 788 N.W.2d 461 (2010); *People v. Miller*, No. 269412, 2004 WL 2534367, at *3 (Mich. Ct. App. Nov. 9, 2004).

In light of this pre-*Melendez-Diaz* caselaw, counsel cannot be deemed ineffective for failing to object to the medical examiner's testimony on the basis of *Crawford*. It is well established that counsel does not render constitutionally deficient performance by failing to anticipate a change in the law. *See Lott v. Coyle*, 261 F.3d 594, 609 (6th Cir. 2001); *Lucas v. O'Dea*, 179 F.3d 412, 420 (6th Cir. 1999). "Counsel's failure to raise issues . . . that only later gain 'judicial recognition' does not constitute ineffectiveness." *Francois v. Wainwright*, 741 F.2d 1275, 1285 (11th Cir. 1984); *see also, Branch v. Cupp*, 736 F.2d 533, 537 (9th Cir. 1984); *United States v. Canniff*, 521 F.2d 565, 573

n.7 (2d Cir. 1975).  In light of the uniform interpretation of *Crawford* as not applying to autopsy reports, counsel was not deficient in failing to anticipate the rule established in *Melendez-Diaz*.  Nor did anything in *Crawford* itself suggest that autopsy reports constitute testimony hearsay such that counsel should have objected on the basis of *Crawford*.  An autopsy report does not fall within the "core" class of testimonial statements that *Crawford* actually identified.  If any thing, the language of *Crawford* suggested the opposite:  autopsy reports are often admitted under the business records or public records exception to the hearsay rule, *see De La Cruz*, 514 F.3d at 133; *Lewis*, 2008 WL 1733718, at *5, and the *Crawford* Court itself observed that such records are generally "statements that by their nature [are] not testimonial."  *Crawford*, 541 U.S. at 56.

In light of the language of *Crawford* and the uniform view that *Crawford* does not apply to autopsy reports which held until *Melendez-Diaz*, counsel was not deficient in failing to raise a *Crawford* objection to the medical examiner's testimony.  *See Moorehouse v. DeCamp*, No. 09-980, 2010 WL 2367499, at *5 (May 21, 2010), *magistrate judge's report adopted*, 2010 WL 2367486 (D. Or. June 10, 2010); *Smith v. Warden*, No. 1:09-CV-251, 2010 WL 3075166, at *26 (Apr. 14, 2010), *magistrate judge's report adopted*, 2010 WL 3075276 (S.D. Ohio Aug. 4, 2010).  Further, petitioner cannot show that he was prejudiced by counsel's failure to raise such an objection.  In light of the state of the law at the time, any such objection would have been overruled, and in any event it is reasonably likely that, had such an objection been sustained, the prosecutor would merely have presented the testimony of the examiner who conducted the autopsy.  *See Flournoy v. Small*, No. 08-2298, 2010 WL 5021495, at *15 (June 14, 2010), *magistrate judge's report adopted*, 2010 WL 5021196, at *7 (S.D. Cal. Dec. 3, 2010).  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### d. Closing Argument

Finally, petitioner contends that his trial counsel was ineffective for failing to argue that he could not have killed the victim because the weapon which was alleged to have caused the victim's death was only fired into the bedroom, but the prosecution argued that the victim was shot at the front door.  In his brief in support of his original habeas application, petitioner asserts that the evidence showed 17 bullet strikes in the living room wall, which in the opinion of Detective Rem were fired from the living room, not from the front door or hallway areas.  According to petitioner, these bullets "were fired from north to south, from living room to bedroom, and the bullets in the bedroom correspond to the ones in the living room.  It is clear that 17 bullet holes went straight through the wall, north to south, indicating that whoever fired these shots was standing in the living room.  There is no way that this 762 x 39 caused decedent's death, and trial counsel was ineffective for not presenting this to the jury."  Pet., at 6.  Petitioner, however, does not point to the specific testimony establishing that 17 bullet holes went straight through the wall, north to south.  On the contrary, Officer Rem testified that some 7.62 x 39 casings were recovered in the outside hallway, and that there were bullet holes in the interior hallway of the apartment having a pattern indicative of the shots coming from the hallway outside the apartment.  And counsel did argue that, despite the prosecutor's theory of the case, not a single witness testified that petitioner had fired from outside the apartment.  *See* Trial Tr., dated 8/31/04, at 75-76.  Counsel also argued that the bullet trajectory evidence supported the defense theory that the victim was shot by Steele from inside the apartment.  *See id.* at 78-79, 82-83.  Counsel extensively argued the defense theory of the case, and effectively argued that the bullet trajectory evidence supported a finding of not guilty.  That this argument was unsuccessful does not render counsel's performance deficient.  Accordingly, the Court should

conclude that petitioner is not entitled to habeas relief on this claim.

      3.     *Appellate Counsel*

Petitioner next contends that his appellate counsel was ineffective for failing to raise on direct appeal the claims that petitioner raised in his motion for relief from judgment. In the appellate counsel context, a showing of prejudice requires a showing that petitioner's claims would have succeeded on appeal. *See Smith v. Robbins*, 528 U.S. 259, 285-86 (2000); *McCleese v. United States*, 75 F.3d 1174, 1180 (7th Cir. 1996). As explained in this Report, all of petitioner's claims are without merit, and thus petitioner cannot show that counsel was ineffective for failing to raise them on direct appeal. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

I.     *Recommendation Regarding Certificate of Appealability*

      1.     *Legal Standard*

As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1). The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). As the Sixth Circuit has noted, this language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack v. McDaniel*, 529 U.S. 473, 483 (2000). Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously

less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue. Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further."'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893 n.4)); *accord Slack*, 529 U.S. at 483-84. Although the substantive standard is the same, "[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable." *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254. The rule tracks § 2253(c)(3)'s requirement that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not issue." FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); *see id.*, advisory committee note, 2009 amendments. In light of the new Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, I include a recommendation regarding the certificate of appealability issue here.

2.      *Analysis*

40

If the Court accepts my recommendation regarding the merits of petitioner's claims, the Court should also conclude that petitioner is not entitled to a certificate of appealability, for the reasons explained above. Petitioner's due diligence, innocence, and weight of the evidence claims are state law claims not cognizable on habeas review, and thus the resolution of these claims is not reasonably debatable. In light of the witness testimony and the bullet casings found outside the apartment supporting that testimony, the resolution of petitioner's sufficiency of the evidence claim is not reasonably debatable. Further, because the prosecutor's comments were proper arguments that the jury should evaluate the evidence in light of its common sense and were responsive to defense counsel's arguments, the resolution of petitioner's prosecutorial misconduct claim is not reasonably debatable. Finally, the resolution of petitioner's various ineffective assistance of counsel claims is not reasonably debatable for the reasons explained in connection with those claims. Accordingly, the Court should conclude that petitioner is not entitled to a certificate of appealability.

J.      *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus. If the Court accepts this recommendation, the Court should deny petitioner a certificate of appealability.

III.    <u>NOTICE TO PARTIES REGARDING OBJECTIONS</u>:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of

41

appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*,

932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of

objections which raise some issues but fail to raise others with specificity, will not preserve all the

objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of Health*

*& Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local*

*231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any

objections is to be served upon this Magistrate Judge.

     Within fourteen (14) days of service of any objecting party's timely filed objections, the

opposing party may file a response.  The response shall be not more than five (5) pages in length

unless by motion and order such page limit is extended by the Court.  The response shall address

specifically, and in the same order raised, each issue contained within the objections.


                                   s/Paul J. Komives
                                   PAUL J. KOMIVES
                                   UNITED STATES MAGISTRATE JUDGE

Dated:4/13/11

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record and  by electronic means or U.S. Mail on April 13, 2011.

              s/Eddrey Butts
              Case Manager